23 F.3d 409
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Emmit Lewis YARBROUGH, Jr. (93-1769), Roosevelt Dix, Jr.,
(93-1796), Defendants-Appellants.
 Nos. 93-1769, 93-1796.
 United States Court of Appeals, Sixth Circuit.
 May 9, 1994.
 
 Before: KENNEDY, MILBURN, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants Emmit Yarbrough, Jr. and Roosevelt Dix, Jr., aka Alvin Dix, challenge their jury convictions of one count of conspiracy to possess cocaine and cocaine base with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1) and 846, one count of possession of cocaine base and cocaine with intent to distribute and distribution in violation of 21 U.S.C. Sec. 841(a)(1), one count of using or carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. Sec. 924(c)(1), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1). Dix also challenges the sentence imposed by the district court.
 
 
 2
 On appeal, the issues presented by defendant Yarbrough are whether sufficient evidence was presented at trial to support his convictions of the use of a firearm in relation to a drug trafficking crime and of being a felon in possession of a firearm. The issues presented by defendant Dix are (1) whether sufficient evidence was presented at trial to support his convictions, (2) whether the district court erred in enhancing his total offense level by two levels for obstruction of justice under United States Sentencing Guidelines ("U.S.S.G.") Sec. 3C1.1, and (3) whether the district court erred in calculating his criminal history score. For the reasons stated, we affirm in both cases.
 
 I.
 A.
 
 3
 Defendants Yarbrough and Dix were indicted by a federal grand jury on September 24, 1992. On October 26, 1992, defendants were arraigned and each pled not guilty. On November 17, 1992, a superseding indictment was returned against defendants. In count 1 of the superseding indictment, defendants were charged with conspiracy to distribute cocaine and cocaine base. Count 2 of the superseding indictment charged defendants with possession of cocaine and cocaine base with intent to distribute and distribution of cocaine and cocaine base. Count 3 of the superseding indictment charged defendants with carrying a firearm during and in relation to a drug trafficking crime. Count 4 of the superseding indictment charged Yarbrough with being a felon in possession of a firearm; count 5 of the superseding indictment charged Dix with being a felon in possession of a firearm. Count 6 of the superseding indictment charged Rynold Collins with being a felon in possession of a firearm. On December 17, 1992, a second superseding indictment was returned by the grand jury, and the second superseding indictment was identical to the first, except that in count 6, Rynold Collins was charged with making false statements before a grand jury in violation of 18 U.S.C. Sec. 1623. Rynold Collins pled guilty to the charge in count 6 of the second superseding indictment.
 
 
 4
 On March 8, 1993, defendants' jury trial commenced. On March 17, 1993, the jury returned guilty verdicts on all of the counts against both Yarbrough and Dix.
 
 
 5
 Defendants were sentenced on May 28, 1992. Dix was sentenced to 110 months' incarceration on counts 1, 2, and 5, with the sentences to run concurrent to each other, and 120 months' incarceration on count 3, with that sentence to run consecutive to his sentences on counts 1, 2, and 5. Yarbrough was sentenced to 144 months' incarceration on counts 1 and 2, with the sentences to run concurrent to each other, and to 120 months' incarceration on count 4, with that sentence to run concurrent to all other sentences. Yarbrough was also sentenced to 120 months' incarceration on count 3, with that sentence to run consecutive to his sentences on counts 1, 2, and 4. This timely appeal followed.
 
 B.
 
 6
 At approximately 9:30 p.m. on July 16, 1992, Robert O'Brien, a police officer in Benton Township, Michigan, was patrolling the Blossomland Housing Project in a marked police cruiser. As Officer O'Brien neared the intersection of Highland and Concord Streets, he observed approximately seven individuals huddled near the southwest corner of the intersection. Based upon his thirteen years of experience as a policeman and his knowledge that this particular area was a high intensity location for both drug and weapons offenses, Officer O'Brien suspected that the individuals were involved in a drug transaction.
 
 
 7
 Officer O'Brien drove through the intersection, parked a few blocks away, and radioed for assistance. After additional police officers arrived, Officer O'Brien returned to the intersection of Highland and Concord Streets. As he approached the intersection, Officer Robert O'Brien received a radio transmission from Officer Tim O'Brien of the Benton Harbor, Michigan, Police Department. Officer Tim O'Brien testified at the trial that he saw two individuals run from the front of the house on the southeast corner of Highland and Concord, 115 Concord Street, to the rear of the house. Officer O'Brien later stated that one of the individuals was wearing a red, white, and blue jogging suit and that the other was wearing blue jeans with a white and orange T-shirt.
 
 
 8
 After receiving the radio message, Officer Robert O'Brien approached the rear of the house at 115 Concord Street and observed these same two individuals come around from the front of the house. Although O'Brien ordered the two individuals to stop, they ran through the back door of the house at 115 Concord Street, slammed the door, and locked it. After discovering that the back door was locked, Officer Robert O'Brien ran around to the front door of the house. He knocked on the front door of the residence but received no reply. Through the front window of the house, Officer Robert O'Brien observed Linda Ellis, the tenant, in the kitchen and defendant Dix, who was wearing a red, white, and blue jogging suit, sitting on the couch with Rynold Collins next to him. Officer Robert O'Brien knocked on the window; Linda Ellis came to the door and consented to a search of her home.
 
 
 9
 Officer Robert O'Brien, accompanied by Officers Steve Barker and Michael Grenon, entered the residence. Officer Barker tried to obtain identification from Dix but was given a false name. Officer O'Brien went through the living room and into the back hallway of the residence. At that point, O'Brien observed Yarbrough, who was wearing blue jeans and an orange and white T-shirt, come out of the bathroom. Yarbrough was carrying a clear plastic bag which contained a white rocklike substance, which Officer O'Brien believed was rock cocaine.
 
 
 10
 Defendant Yarbrough turned around and threw the plastic bag into the toilet. Officer O'Brien informed Yarbrough that he was under arrest. Yarbrough resisted arrest and tried to reach a loaded .44 caliber revolver which was located on a shelf behind Officer Robert O'Brien. Thereafter, Officers Tim O'Brien and Dan Unruh were able to assist Officer Robert O'Brien. Finally, with the aid of approximately seven officers, Yarbrough was arrested.
 
 
 11
 While Yarbrough was being arrested, Officer Steve Barker requested that Dix and Rynold Collins get off the couch and kneel down on the living room floor between the television and a chair. Dix and Collins were told to place their hands behind their heads.
 
 
 12
 After Yarbrough was removed from the residence and placed in a police cruiser, the officers performed a consensual search of the house. Behind a chair in the living room, the one closest to where defendant Dix was kneeling, three packets of rock cocaine were located. Also, two shotguns, a sawed-off shotgun, and a short-barreled shotgun were located under the couch upon which Dix and Collins had been sitting when the police entered the residence. A six-shot .38 caliber revolver was located in a back bedroom on the main floor. Also seized in the search was $453 which was found in Yarbrough's pants pocket. The plastic bag which the officers retrieved from the toilet contained a smaller plastic bag which held 18 small rocks of individually packaged crack cocaine weighing 1.323 grams, a second small plastic bag which held a large rock of cocaine weighing 6.422 grams, and a third small plastic bag which held powder cocaine weighing .472 grams. The three small plastic bags of rock cocaine which were found in or near the chair in the living room weighed a total of .216 grams. The total weight of rock/powder cocaine which was seized was 8.42 grams. At trial, Lieutenant Milt Agay of the Benton Harbor Police Department testified that this crack cocaine had an approximate street value of $1,600 and that the large rock of crack cocaine could be further cut into 108 smaller rocks of crack cocaine which would be suitable for sale on the street.
 
 
 13
 Linda Ellis, the tenant of 115 Concord Street, testified that she lived at the residence with Rynold Collins and her four children. She testified that during the afternoon of July 16, 1992, she walked over to her mother's house to do some laundry. When she returned home later in the day, Collins introduced her to Yarbrough and Dix. Ellis then left her residence to return to her mother's home. Ellis testified that sometime later she returned to her residence to do some cleaning and found two shotguns under the couch. She stated that after finding the shotguns, she told Collins to tell Yarbrough and Dix to take their shotguns and leave her house.
 
 
 14
 Ellis then left her residence once again and returned to her mother's home. Later that evening, Ellis returned to her residence to prepare dinner for her children. Ellis stated that she started cooking some hamburger and went upstairs for a moment. While she was upstairs in her residence, Ellis stated that she heard a lot of commotion downstairs, i.e., doors slamming and people running. Collins then called her downstairs. While Ellis was in the kitchen, she saw defendant Dix run out of the back bedroom carrying a shotgun, which he took into the living room and threw under the sofa. At about that time, Officer Robert O'Brien knocked on the window, and Ellis opened the door and gave him permission to search her home. Ellis testified that Dix was wearing a red, white, and blue jogging suit, and Yarbrough was wearing blue jeans and a T-shirt.
 
 
 15
 On cross-examination, Ellis admitted that she gave false testimony to the grand jury which was investigating the matter. She testified that her false testimony was the result of fear of defendants Dix and Yarbrough due to threatening letters which she had received from defendant Yarbrough.
 
 
 16
 Rynold Collins, who had pled guilty to count six (perjury) of the superseding indictment on the morning of the trial, testified that on July 16, 1992, he was at 115 Concord Street with Linda Ellis and her children. Collins testified that Dix and Yarbrough came to the home at approximately 7:30 p.m. He had previously known Yarbrough when they were children growing up together in Gary, Indiana.
 
 
 17
 Collins testified that Dix and Yarbrough carried two large gym-type bags with them containing short barreled shotguns which defendants referred to as street or riot guns. Collins testified that both Dix and Yarbrough advised him that they utilized the guns to protect their drugs and drug areas. Collins further testified that he told Dix and Yarbrough that he did not want the shotguns in the house. Later that evening, Ellis informed Collins that she had found the shotguns under the couch, and she told Collins to get both the guns and defendants out of her house. Collins testified that he again confronted defendants concerning the weapons and that they agreed to leave and take the weapons with them.
 
 
 18
 Collins testified that later that evening, he was upstairs in the residence when he heard the police outside yell, "Freeze, stop." After hearing one of the doors in the house slam, he went downstairs, and defendants were running around and telling him not to let the police in. Collins stated that he saw Yarbrough throw a shotgun under the sofa and that he saw the .44 caliber revolver in the waistband of Yarbrough's pants. According to Collins, he called Linda Ellis to come downstairs. Collins denied possession of either the firearms or drugs.
 
 
 19
 Collins also admitted that he lied to the federal grand jury which was investigating the case. He testified that he lied in order to protect himself and his family. Collins testified that he started receiving threatening letters from both defendants approximately two weeks after they were arrested. According to Collins, some of the letters threatened that if he and Linda Ellis did not keep quiet and do as the letters instructed, they would be killed. Collins testified that in the letters Yarbrough instructed him how he should testify. Collins stated that he did not keep all of the letters; however, he did keep two of the letters from defendant Yarbrough which explained how Collins was to testify. Specifically, Collins was instructed to falsely testify that there were more people in the house at the time that the police performed their search and that these individuals left or escaped from the house while the police were struggling with Yarbrough. Collins testified that he was telling the truth at trial because he felt that it was in the best interests of his family.
 
 
 20
 Defendants Dix and Yarbrough also testified at trial. Defendant Dix testified that he and Yarbrough left Gary, Indiana, by Greyhound bus on July 15, 1992. He testified that he was wearing a red, white, and blue jogging suit. Dix stated that he had no identification with him but that he had $180 in cash with him. Dix stated that he spent $20 to purchase his bus ticket and that he gave the remainder of the money to Yarbrough to keep for him. Dix denied having either guns or cocaine with him.
 
 II.
 A.
 
 21
 Both defendants argue that there was insufficient evidence to support their convictions. Defendant Yarbrough asserts that insufficient evidence was admitted to sustain his convictions of using or carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. Sec. 924(c)(1) and for being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g)(1). Defendant Dix challenges all of his convictions.
 
 
 22
 In this case, both defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case. Both defendants then testified in addition to other witnesses. However, it does not appear from the record that defendants renewed their Rule 29 motions at the end of all of the evidence. A failure to renew a motion for a judgment of acquittal at the close of all the evidence limits the reviewing court to examine the record for plain error or to determine whether a manifest miscarriage of justice has occurred. United States v. Rigsby, 943 F.2d 631, 644 (6th Cir.1991) (citing United States v. Pennyman, 889 F.2d 104, 105 n. 1 (6th Cir.1989)), cert. denied, 112 S.Ct. 1269 (1992).
 
 
 23
 If the defendants had properly preserved the issue of the sufficiency of the evidence for appeal by renewing their Rule 29 motions at the close of all the evidence, the standard of review for a challenge to the sufficiency of the evidence would have been "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In making such a review, "[w]e consider both the evidence and any inferences 'reasonably and justifiably drawn therefrom." United States v. White, 788 F.2d 390, 393 (6th Cir.1986) (quoting United States v. Conti, 339 F.2d 10, 13 (6th Cir.1964)). On review, this court "may conclude a conviction is supported by sufficient evidence even though the circumstantial evidence does not 'remove every reasonable hypothesis except that of guilt." United States v. Clark, 928 F.2d 733, 736 (6th Cir.) (per curiam) (quoting United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984)), cert. denied, 112 S.Ct. 144 and 240 (1991). Further, issues of credibility are strictly for determination by the jury. United States v. Evans, 883 F.2d 496, 501 (6th Cir.1989).
 
 
 24
 Regardless of which standard of review is applied to this case, it is clear from the record that sufficient evidence was produced at trial to support defendants' convictions. On appeal, both defendants argue that since two of the government's witnesses, Linda Ellis and Rynold Collins, admitted that they committed perjury before a federal grand jury, their testimony is highly suspect and cannot be a basis to support the jury's guilty verdicts. However, defendants' arguments that their convictions should be reversed because of the lack of credibility or unreliability of the testimony of Ellis and Collins is meritless.
 
 
 25
 In this case, the jury had an opportunity to observe the manner and demeanor of both Ellis and Collins on the witness stand. On direct examination by the government of both Ellis and Collins, it established not only that Ellis and Collins had committed perjury before the federal grand jury, but also that Collins had pled guilty to a charge of perjury based upon his testimony before the grand jury. Further, on direct examination, the government also established a reason for Ellis' and Collins' perjury before the grand jury; namely, fear for their own safety and the safety of their children stemming from the threatening letters which had been allegedly authored by the defendants. Moreover, both Ellis and Collins were subjected to detailed and exhaustive cross-examination by attorneys for both defendants. Lastly, since both defendants Dix and Yarbrough testified at trial, the jury had the opportunity to observe their demeanor and hear their testimony and to compare the credibility of Ellis and Collins with the credibility of Dix and Yarbrough. As noted above, credibility determinations are for the jury, and the jury obviously resolved the issue of credibility in favor of Ellis and Collins.
 
 
 26
 More specifically, defendant Dix's convictions under counts 1 and 2 of the indictment are supported by sufficient evidence. In count 1, Dix and Yarbrough were charged with conspiracy to possess cocaine and cocaine base with intent to distribute, and in count 2, defendants were charged with possession of cocaine and cocaine base with intent to distribute. The essential elements of possession with intent to distribute a controlled substance are (1) the knowing and intentional possession, (2) of a controlled substance (3) with intent to distribute. Clark, 928 F.2d at 735. The quantity of the drug possessed is not an element of the offense. Id. Further, the intent to distribute may be established by circumstantial evidence, including the possession of a large quantity of the controlled substance or the estimated street value of the substance. United States v. Franklin, 728 F.2d 994, 998-99 (8th Cir.1984).
 
 
 27
 The essential elements of a charge of conspiracy to possess a controlled substance with the intent to distribute are (1) that the defendants entered into an agreement to possess with intent to distribute and/or distribution of the controlled substance, (2) that they did so willingly, and (3) that at least one of the conspirators knowingly committed at least one overt act in furtherance of the conspiracy. United States v. Hitow, 889 F.2d 1573, 1577 (6th Cir.1989). No formal or express agreement is required, and the existence of the agreement can be inferred from the acts done in furtherance of the conspiracy. Id. Further, once the existence of the conspiracy is proven, only slight evidence is necessary to connect a defendant with the conspiracy; namely, it is only necessary to show that defendant knew of the object of the conspiracy, associated himself with it, and knowingly contributed his efforts in its furtherance. Id.
 
 
 28
 In this case, there was abundant evidence of a conspiracy between Dix and Yarbrough to sustain Dix's conviction. Both defendants testified that they traveled from Gary, Indiana, to Benton Township, Michigan. Dix carried no identification and he had given Yarbrough at least $160 in cash to hold for him. Two police officers testified that while patrolling an area known to be a high density crime area, they saw Dix and Yarbrough running into the back door of 115 Concord Street and they appeared to be carrying something.
 
 
 29
 During the search of 115 Concord Street, the police found two short barreled shotguns under the couch upon which Dix was sitting and three packets of crack cocaine in or near the living room chair near which Dix was kneeling prior to his arrest. Further, Officer Robert O'Brien observed a plastic bag containing a quantity of crack cocaine in Yarbrough's hand, saw Yarbrough throw the bag into the toilet, and then, while trying to arrest Yarbrough, struggled with Yarbrough while Yarbrough attempted to reach for a loaded .44 caliber revolver.
 
 
 30
 Further, the cocaine which was retrieved from the toilet was consistent with drug trafficking because, in addition to other smaller rocks of crack cocaine, it contained one large rock of crack cocaine with a street value of $1,600 and which, according to the testimony, could be subdivided into approximately 108 smaller rocks of crack cocaine for "street" use. Clearly this amount of crack cocaine is inconsistent with personal use. There was testimony from Rynold Collins that defendants told him they had traveled to Benton Township to "scope out the drug areas and stuff," J.A. 185, and that defendants showed the shotguns to Collins and told him that the guns were used to protect their drugs and drug areas. Finally, there was also evidence that both Collins and Linda Ellis received threatening letters from defendants, which also told them how to testify before the grand jury.
 
 
 31
 Thus, in this case, there was clearly sufficient evidence, both direct and circumstantial, linking both defendants to a conspiracy to distribute crack cocaine, and the same evidence is sufficient to support their convictions of possession of crack cocaine with intent to distribute. Therefore, defendant Dix's argument that insufficient evidence exists to support his convictions on counts 1 and 2 is meritless.
 
 B.
 
 32
 Both defendants argue that insufficient evidence was presented to support their convictions for using or carrying a firearm in relation to a drug trafficking offense. Both defendants assert that because Rynold Collins was seated on the sofa next to Dix, it is just as likely that the shotguns were his. However, Collins testified that the shotguns were defendants and that he saw the .44 caliber revolver in the waistband of Yarbrough's pants when defendants ran into his home as they were fleeing from the police. Moreover, despite Collins' admission of perjury before the grand jury, this is an issue of credibility for the jury, and the jury resolved the issue against defendants.
 
 
 33
 Further, defendant Dix argues that the shotguns could not have been his because he testified that he traveled from Indiana to Michigan by bus. However, this argument is both meritless and ridiculous. There is absolutely no evidence in this case that Dix had to pass through metal detectors when traveling by Greyhound bus from Indiana to Michigan.
 
 
 34
 Moreover, as noted above, Rynold Collins testified that defendants told him they were in Michigan to "scope out" drug areas and that they showed him the shotguns and told him that the guns were to protect their drugs and drug areas. Further, when Officer Robert O'Brien attempted to arrest defendant Yarbrough, Yarbrough struggled with the officer and attempted to reach a loaded .44 caliber revolver which Collins had previously seen tucked into the waistband of Yarbrough's pants. Therefore, sufficient evidence was presented to sustain defendants' convictions of using or carrying firearms during and in relation to a drug trafficking crime.
 
 C.
 
 35
 Finally, both defendants argue that insufficient evidence was presented to sustain their convictions of being a felon in possession of a firearm. At trial, both defendants stipulated that they were previously convicted felons and that the guns seized by the police had traveled in interstate commerce. Based upon the evidence described above, particularly Rynold Collins' testimony, sufficient evidence was presented to sustain defendants' convictions of being felons in possession of a firearm.
 
 D.
 
 36
 Defendant Dix argues that the district court erred in enhancing his total offense level by two levels for obstruction of justice under U.S.S.G. Sec. 3C1.1. At sentencing, the district court enhanced Dix's offense level by two levels based upon the district court's finding that Dix had committed perjury at the trial. The district court stated in relevant part:
 
 
 37
 I feel bound at this stage to make the following finding: that the defendant did testify under oath--he was sworn in--and that he testified to material facts; namely, whether he went into the house with a bag, the ownership of the gun in the bag, or at least the control of the gun in the bag. And in this particular case, it was material as to whether--where the defendant was sitting when the police officers came into the house of Miss Ellis. And based on my observation of the defendant and based on my observation of the other witnesses, I find that the defendant testified falsely and, therefore, would be guilty of perjury and receive the two-point enhancement.
 
 
 38
 I think the testimony of Rynold Collins bothers me, obviously, as I said earlier. And I can't do anything about that at this stage. But I think in some areas, he testified truthfully; and some areas, quite frankly, he testified untruthfully. And that's the exact instruction I gave to the jury, and the jury sorts that all out. But I don't credit his testimony--and I want this clear on the record--when he said that Mr. Dix sent him threatening letters or made any threats to him. I don't credit that part of his testimony myself. So if this is going to be appealed, I want that part of it clear. I don't think the government carried that part of the case by a preponderance of the evidence, which is the standard I must apply at this time.
 
 
 39
 J.A. 294-95. Thus, the district court's statements at sentencing make it clear that Dix received a two-level enhancement because of perjury, not because of the threatening letters which he allegedly issued.
 
 
 40
 The facts supporting an enhancement under U.S.S.G. Sec. 3C1.1 must be proven by a preponderance of the evidence. United States v. Hoffman, 982 F.2d 187, 191 (6th Cir.1992). This court reviews the district court's findings on the issue of obstruction of justice for clear error. Id. U.S.S.G. Sec. 3C1.1, comment (n. 3) states that the enhancement applies to "committing, suborning, or attempting to suborn perjury."
 
 
 41
 Defendant first argues that he was prejudiced because he was not given notice that he would receive an enhancement for obstruction of justice because he allegedly committed perjury. In the presentence investigation report, the probation officer recommended that defendant receive the enhancement for obstruction of justice under U.S.S.G. Sec. 3C1.1 based upon the threatening letters. At sentencing, the government argued that the obstruction of justice enhancement could be applied based upon defendant's perjury at trial. In his brief on appeal, defendant argues that he was prejudiced when the district court considered the obstruction of justice enhancement based on perjury on the day of sentencing which had not been mentioned in the presentence investigation report. However, in his brief, defendant does not state how he was prejudiced. Furthermore, at sentencing, counsel for the government stated that the government had no objection to a delay in sentencing so that defendant could prepare a response to the government's request for an enhancement for obstruction of justice on the grounds of perjury. Defense counsel neither requested a continuance nor a delay of sentencing. Therefore, defendant was not prejudiced.
 
 
 42
 Further, the district court's finding that the defendant committed perjury is not clearly erroneous. Defendant asserts that the district court erred when it concluded that he had committed perjury. However, when defendant Dix testified at the trial, he insisted that there was a fifth person in Ellis' home, known by the name "Bug" or "Bugg." Dix testified that Bugg walked out of the back of Ellis' home at 115 Concord Street while the police were struggling to arrest Yarbrough. Further, Dix denied running into the back door of the house at 115 Concord Street and denied any knowledge or possession of guns or drugs. Lastly, Dix denied giving a false name to the police when they began searching the home at 115 Concord Street.
 
 
 43
 The Supreme Court has held that: "if a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition." United States v. Dunnigan, 113 S.Ct. 1111, 1117 (1993). In Dunnigan, the Court defined perjury as: "A witness testifying under oath or affirmation violates this statute if [he] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Id. at 1116. Here, the district court made specific findings of fact which addressed the definition of perjury in Dunnigan. Further, as we have concluded that the district court's findings were not clearly erroneous, the district court did not err in enhancing defendant's total offense level under U.S.S.G. Sec. 3C1.1.
 
 E.
 
 44
 Defendant Dix argues that the district court erred in calculating his criminal history category. Pursuant to U.S.S.G. Sec. 4A1.1, defendant was assessed one criminal history point based upon his 1989 Indiana guilty plea conviction on charges of intimidation. This criminal history point had the effect of increasing Dix's criminal history category from category III to category IV. At sentencing, Dix objected to the addition of this one point to his criminal history score, asserting that the Indiana guilty plea conviction was constitutionally infirm because he was unrepresented by counsel.
 
 
 45
 A guilty plea is a waiver of several federal constitutional rights, and a guilty plea is valid if it is made voluntarily and intelligently. Boykin v. Alabama, 395 U.S. 238, 242 (1969). This court has recognized that under certain narrow circumstances, a sentencing court has the discretion to entertain a challenge to the inclusion of a prior state conviction in a criminal history score. United States v. McGlocklin, 8 F.3d 1037, 1044 (6th Cir.1993) (en banc), cert. denied, 1993 WL 557978 (1994). The burden is on the defendant to establish that his prior state sentence is infirm for purposes of calculating the criminal history.
 
 
 46
 "As the Supreme Court recently has made clear, 'even when a collateral attack on a final conviction rests on constitutional grounds, the presumption of regularity that attaches to final judgments makes it appropriate to assign a proof burden to the defendant.' " Id. at 1045 (quoting Parke v. Raley, 113 S.Ct. 517, 524 (1992)).
 
 
 47
 In McGlocklin, this court also set forth procedural requirements to be used by the district courts in exercising their discretion to entertain challenges to the inclusion of prior state convictions in the criminal history score, including (1) that defendant must object to the inclusion of the prior state conviction in the criminal history score in his objections to the presentence investigation report, (2) that defendant must specifically state the grounds for the alleged constitutional invalidity of the prior state conviction, and (3) that defendant must set forth the anticipated means by which proof of invalidity will be made, either by testimony, state court records, or both. Id.
 
 
 48
 In this case, defendant Dix did not submit any documentary evidence to the district court to support his claim that his Indiana conviction for intimidation was constitutionally invalid. The only evidence on this issue which was presented to the district court was the testimony of Dix and the probation officer who prepared the presentence investigation report. Thus, the district court's decision whether or not to include the Indiana conviction in the criminal history score was primarily a credibility assessment.
 
 
 49
 At the sentencing hearing, the probation officer who prepared the presentence investigation report, John Street, testified concerning his interview with Dix. Street testified that he discussed the Indiana conviction with Dix, that Dix discussed the situation openly and freely, and that Dix indicated that he had pled guilty to the charge of intimidation and that he had waived counsel. Moreover, Dix's testimony was somewhat contradictory. Dix claimed that he pled guilty but did not understand the charges against him since he was unrepresented by counsel. On cross-examination, Dix was asked if he recalled the Indiana state judge going through a litany or statement before taking his guilty plea. Dix responded, first, that the judge probably did say something to him, and then responded that the judge did say a few things to him.
 
 
 50
 Based upon the nature of Dix's testimony at the sentencing hearing, considered against the unequivocal testimony of John Street that Dix admitted he had waived counsel and pled guilty in the Indiana case, Dix failed to meet his burden of showing that his guilty plea to intimidation in Indiana was constitutionally invalid. Thus, the district court did not err in calculating Dix's criminal history score.
 
 III.
 
 51
 For the reasons stated, the district court's judgments and sentences in both cases are AFFIRMED.